*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

**UNITED STATES**
Appellee

**v.**

**Jeremy N. NAVARETTE, Specialist**
United States Army, Appellant

**No. 19-0066**
Crim. App. No. 20160786

Argued May 21, 2019—August 1, 2019

Military Judge: S. Charles Neill

For Appellant: *Captain Zachary A. Gray* (argued); *Colonel Elizabeth G. Marotta, Lieutenant Colonel Tiffany D. Pond, Lieutenant Colonel Todd W. Simpson*, and *Captain Joseph C. Borland* (on brief).

For Appellee: *Captain Lauryn D. Carr* (argued); *Colonel Steven P. Haight, Lieutenant Colonel Eric K. Stafford*, and *Lieutenant Colonel Wayne H. Williams* (on brief).

Judge SPARKS delivered the opinion of the Court, in which Judges RYAN, OHLSON, and MAGGS, joined. Chief Judge STUCKY filed a separate dissenting opinion.

————————

Judge SPARKS delivered the opinion of the Court.

This case arises out of the conviction by members, contrary to his pleas, of Specialist (E-4) Jeremy N. Navarette of one specification of wrongful distribution of cocaine in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2012). Appellant was sentenced to ninety days of confinement, forfeiture of all pay and allowances, reduction to E-1, and a bad-conduct discharge. The convening authority approved the sentence.

Approximately three months after filing his brief with the United States Army Court of Criminal Appeals, appellate defense counsel moved to stay appellate proceedings and requested a Rule for Courts-Martial (R.C.M.) 706 inquiry to assess Appellant's competence to participate in appellate proceedings, his ability to

understand or cooperate intelligently in his trial, and his degree of mental responsibility when the offense occurred. The lower court denied the motion and affirmed the findings and sentence. In their written opinion, the lower court concluded that "the primary basis for the R.C.M. 706 inquiry [was] appellant's competency" and noted that Appellant had requested that court to "order an inquiry into his mental responsibility at the time of the offense" *if* it ordered "an inquiry into [his] current mental status." *United States v. Navarette*, No. ARMY 20160786, 2018 CCA LEXIS 446, at *4 & n.4, 2018 WL 4510119, at *2 & n.4 (A. Ct. Crim. App. Sept. 17, 2018). Appellant then petitioned this Court and we granted review to determine whether the Army Court erroneously denied Appellant a post-trial R.C.M. 706 inquiry.[1] For reasons to follow, we opt not to directly answer the granted issues because of concerns that the lower court's review under Article 66, UCMJ, 10 U.S.C. § 866, remains incomplete.

## Background

The charge in this case arises out of an encounter Appellant had with an undercover law enforcement agent, Special Agent Stewart, at a bar outside Fort Drum, New York. Appellant, who was not the target of the undercover operation, approached Special Agent Stewart, they talked and exchanged phone numbers, and he invited her to a party. Later, Appellant texted Special Agent Stewart,

---

[1] This Court granted oral argument on the following issues:

> I. Whether the Army Court erroneously denied Appellant a post-trial R.C.M. 706 inquiry by requiring a greater showing than a non-frivolous, good faith basis articulated by *United States v. Nix*, 15 C.M.A. 578, 582, 36 C.M.R. 76, 80 (1965).

> II. Whether the Army Court erred when it held that submitting matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), was evidence of Appellant's competence during appellate proceedings.

mentioning that he would get liquor, and she responded that she was looking for something else. Appellant asked if she meant cocaine and marijuana (using slang terms for the drugs) and Special Agent Stewart told him yes. Two weeks later, Appellant sold Special Agent Stewart three-and-a-half ounces of cocaine.

At trial, defense counsel argued that Appellant had been entrapped and sold the drugs to Special Agent Stewart because she was pretty, not because he dealt drugs. Though he did not pursue the defense of mental responsibility,[2] defense counsel did introduce Appellant's post-traumatic stress disorder (PTSD) and attention deficit disorder (ADD) as evidence of Appellant's extreme suggestibility.

Three months after filing his brief with the Army Court of Criminal Appeals on April 27, 2018, appellate defense counsel requested a stay of proceedings for an R.C.M. 1203(c)(5) inquiry. As part of his motion, appellate defense counsel submitted Appellant's discharge paperwork following a nearly seven-week involuntary hospitalization for psychiatric care in the state of California and a detailed letter from the psychiatrist who treated Appellant during his hospital stay. Appellant was also involuntarily hospitalized twice just prior to appellate defense counsel's filing, from March 26, 2018, to April 2, 2018, and from April 7, 2018, to April 22, 2018.

The letter and discharge paperwork stated that Appellant was diagnosed with bipolar disorder and PTSD.[3] While in a manic state, Appellant had entered a grade school believing he worked for the FBI and had to educate the children about responding to a terrorist attack. He also crashed his car into a school bus, made threats against other people, and attempted to kill himself with a cord around his neck. The third involuntary hospitalization lasted from May 9, 2018, to June 26, 2018. This period of hospitalization

---

[2] Trial defense counsel informed the military judge that a mental responsibility defense would be incorporated into the defense of entrapment.

[3] Prior to this hospitalization, including at the time of court-martial, Appellant's mental health diagnosis had included PTSD, ADD, anxiety, and depression.

required two extensions by the Mental Health Division of the Los Angeles County Superior Court, which necessitated that court finding that Appellant qualified as "gravely disabled" with each extension.

Appellant's psychiatrist concluded that Appellant had experienced recurrent manic and depressive episodes over the course of his personal history, with the bipolar disorder most likely beginning in adolescence or early adulthood. He stated that bipolar disorder is characterized by impaired judgment and decision-making capacity "as judgment and awareness of consequences are certainly compromised by the underlying bipolar illness." "The coexistence of the posttraumatic stress disorder only complicates this clinical picture and the patient's capacity to function."

Appellate defense counsel declined to answer questions from the lower court regarding Appellant's ability to communicate with his client, citing attorney-client privilege, nor did he directly state any concern about Appellant's competence to participate in the appellate process.

## Discussion

R.C.M. 706 governs trial level inquiries into the mental capacity of an accused. The rule offers guidelines for a mental health query by a board of one or more qualified professionals to determine whether the accused, at the time of the offense and as a result of severe mental disease or defect, was "unable to appreciate the nature and quality or wrongfulness of his or her conduct" and whether, at the time of the court-martial, the accused suffered "from a mental disease or defect rendering the accused unable to understand the nature of the proceedings against the accused or to conduct or cooperate intelligently in the defense." R.C.M. 706(c)(2)(C), R.C.M. 706(c)(2)(D).

R.C.M. 1203(c)(5) allows that an appellate authority may order a psychiatric evaluation in accordance with R.C.M. 706 if a "substantial question is raised as to the requisite mental capacity of the accused." The requisite capacity contemplated by R.C.M. 1203(c)(5) is the capacity to "conduct and cooperate intelligently in the appellate proceedings." "In the absence of substantial evidence to the

contrary, the accused is presumed to have the capacity to understand and to conduct or cooperate intelligently in the appellate proceedings." *Id.* Thus, the rule requires that an appellant establish a nexus between his mental impairment and his ability to participate intelligently in the proceedings.[4]

The lower court found no substantial question raised regarding Appellant's competency for three reasons. First, Appellant's discharge paperwork after his extended psychiatric hospital stay indicated Appellant was responding well to treatment and presented no issues that would cause the court to question competency. The paperwork indicated that Appellant displayed, with the help of a medication regimen, "remarkable improvement," "complete resolution of psychotic symptomatology," and good insight and judgment. Second, the lower court stated that defense counsel had asserted no actual claim that Appellant was too mentally unstable to understand or cooperate with the proceedings, in line with the standard for incompetence outlined in R.C.M. 909(a). Third, the lower court noted that Appellant submitted two *Grostefon* issues, neither of which offered any indication Appellant was unable to competently assist in his appeal.

Generally, the decision to grant or deny a motion for a sanity board is reviewed for an abuse of discretion. *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008) (citing *United States v. Collins*, 60 M.J. 261, 266 (C.A.A.F. 2004)). Under the abuse of discretion standard, "[f]indings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo." *United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011). We acknowledge that abuse of discretion is the correct standard for assessing the Army Court of Criminal Appeals decision. However, prior to making our assessment, we find it

---

[4] If the lower court orders an R.C.M. 706 hearing under R.C.M. 1203(c)(5), it is within that court's discretion to determine the scope of the inquiry and whether to include an inquiry into an appellant's mental capacity at the time of trial and/or at the time of the offense. *United States v. Massey*, 27 M.J. 371, 374 (C.M.A. 1989).

prudent to raise two concerns surrounding Appellant's medical condition that we feel should be more thoroughly addressed to ensure a proper Article 66, UCMJ, review.

Our first and primary concern is that a sufficient nexus has not been established between Appellant's medical condition and his ability to cooperate intelligently in the appellate proceedings. In order to obtain an R.C.M. 706 inquiry at the appellate level, an appellant must make a showing that there is a sufficient reason to question either his mental capacity or mental responsibility. *See United States v. Young*, 43 M.J. 196, 197 (C.A.A.F. 1995). Thus, an appellant must, at a minimum, articulate how his mental condition prevents him from being able to understand or participate in the proceedings. Without such a nexus, Appellant does not raise a "substantial question" as to his mental capacity.[5] Here, Appellant has yet to articulate how his mental condition affects his ability to participate in his appellate proceedings, and it was not an abuse of discretion for the lower court to require him to do so.

We recognize and fully support that appellate defense counsel has an ethical obligation to his client not to overstep the attorney-client privilege.[6] However, we note the absence

---

[5] Appellate defense counsel might raise a substantial question by presenting documents or averring facts showing a nexus between Appellant's mental illness and an inability to participate in the proceedings. *See, e.g., United States v. Proctor*, No. ACM 27931, 1990 CMR LEXIS 547, at \*1, 1990 WL 79243, at \*1 (A.F.C.M.R. May 8, 1990) (finding good cause to order the convening of a sanity board where "[t]he documents filed with [the court] indicate appellant's longstanding refusal to cooperate with counsel"; "[a]llied papers show that the appellant asked that his personal copy of the record of trial be destroyed"; and "defense counsel avers that the appellant apparently believes he will be freed from confinement by divine deliverance in the fashion of St. Paul").

[6] However, *see United States v. Nelson*, 732 F.3d 504, 519 (5th Cir. 2013) (explaining that physical characteristics that are observable to anyone who interacts with a client like demeanor, bearing, or sobriety are not protected by attorney-client privilege); Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence: Evidentiary Privileges* § 6.7.1 (3d ed. Supp. 2019) (explaining that the "prevailing view" is that an "attorney can be asked to

of even a prima facie statement by counsel or another witness that there is reason to question Appellant's competence to participate in his appeal.

Our second concern is that it is not clear the lower court appropriately considered the degree to which Appellant suffered from serious mental illness that may have impacted his decision-making capacity during the period of appellate representation. The discharge summary and letter from Appellant's treating psychiatrist report ongoing and long-term struggles with mental health. As noted earlier, Appellant was involuntarily hospitalized March 26, 2018, to April 2, 2018, and April 7, 2018, to April 22, 2018. Appellant's third, nearly seven-week long involuntary hospitalization covered a period of time from May 9, 2018, through June 26, 2018. Two of these periods of hospitalization appear to have occurred during the time appellate defense counsel was preparing the brief filed on April 27, 2018. With regard to the longest period of hospitalization, Appellant's treating psychiatrist reported that, upon admission, he demonstrated "symptoms of profound levels of thought and behavioral disorganization" which included "severe loss of impulse control, confusion, [and] delusional and grandiose thinking." Though we recognize that the discharge paperwork indicated Appellant was responding to treatment at the time of his release, we are not yet convinced that Appellant's significant mental health struggles during the period of appellate representation were appropriately considered by the lower court.

## Decision

The decision of the United States Army Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General for remand to the Army Court of Criminal Appeals to (1) give appellate defense

---

disclose … facts about the … mental competency" of a client "even if, in a broad sense, the attorney has learned of the facts by virtue of his or her interaction with the client" but suggesting that the privilege might apply when an opinion about mental capacity "is entirely or largely based on the content of the client's statements" (footnotes omitted)).

counsel the opportunity to make a showing of nexus between Appellant's significant and documented mental health issues and his capacity to participate in appellate proceedings[7]; and (2) give the lower court the opportunity to more fully evaluate Appellant's R.C.M. 1203 motion in light of counsel's representations and all other evidence relating to Appellant's mental capacity, particularly in regard to the events that unfolded during the period of appellate representation.[8]

---

[7] We recognize that, prior to this opinion, we have never explicitly held that such a nexus is required. It is appropriate given R.C.M. 1203(c)(5)'s mandate that "[a]n appellate authority may not affirm the proceedings while the accused lacks mental capacity to understand and to conduct or cooperate intelligently in the appellate proceedings" to afford Appellant the opportunity to establish this nexus.

[8] On July 1, 2019, the Army Office of the Judge Advocate General forwarded to this Court Appellant's petition for a new trial. Given our determination that the lower court's appellate review of Appellant's R.C.M. 1203 motion remains incomplete, we deny Appellant's petition without prejudice.

Chief Judge STUCKY, dissenting.

Appellant suffers from severe mental health issues and requested, through counsel, a sanity board to determine whether those issues rendered him incompetent to participate in appellate proceedings and/or negated his mental responsibility for the offense for which he was convicted. In my view, the United States Army Court of Criminal Appeals (CCA) abused its discretion in denying that request. However, I am more troubled by the manner in which the majority disposes of this case than by my disagreement on that narrow issue. For the foregoing reasons, I respectfully dissent.

## I. Background

### A. Backstory

As Appellant's treating psychiatrist at the U.S. Disciplinary Barracks put it, Appellant had "a very bad childhood." The issues were myriad: he was emotionally and physically abused, his mother was a drug addict, he was raped in high school, and his siblings were taken and placed in foster care. Seeking to gain custody of his siblings, he joined the Army. He did well at first, until returning from a deployment in which his best friend killed another friend of Appellant's by negligently discharging a weapon. Appellant's support of his best friend led his other friends to ostracize him. Meanwhile, his fiancée ended their relationship.

### B. The crime

Against this backdrop, Appellant went out for drinks at an off-base bar. He noticed an attractive woman, so he went over to her, kissed her on the cheek, and told her she was beautiful. Unbeknownst to Appellant, she was in fact Special Agent (SA) Stewart, a member of Criminal Investigation Command, which was conducting an undercover drug operation. Appellant invited her to a party, and the two exchanged phone numbers. Drugs were not discussed.

Later that night, SA Stewart texted Appellant, who responded that he would "grab … alcohol." In response, SA Stewart noted that she was "looking to get [her] friends high" and asked Appellant if he had anything more than

alcohol. Appellant asked if she meant "like yay or bud" (references to cocaine and marijuana, respectively) and, when SA Stewart confirmed that she wanted drugs, he replied that she "met the right dude." Two weeks later, after two failed attempts to acquire them, Appellant delivered the drugs. He continued to express romantic interest in SA Stewart, but never mentioned drugs again.

## C. The fallout

The Government elected to court-martial Appellant for this conduct. Although he did not raise a lack of mental responsibility defense, he attempted to incorporate his mental health into an entrapment defense. He had previously been diagnosed with attention deficit disorder (ADD) and tested in the bottom fraction of a percentile on an IQ assessment.[1] Nonetheless, he was convicted of wrongfully distributing cocaine. He was sentenced to a bad-conduct discharge, reduction to the lowest enlisted grade, forfeiture of all pay and allowances, and confinement for ninety days. The convening authority approved the findings and sentence without any modification.

## D. The aftermath

While in confinement, Appellant was treated for post-traumatic stress disorder (PTSD), anxiety, and obsessive-compulsive disorder. He was released from confinement in late February 2017. In August of that year, he was admitted to Red River Hospital in Wichita Falls, Texas, where he remained for over a month. On March 26, 2018, he was admitted to the Veterans Medical Center Hospital in Long Beach, California, where he remained until April 2. Five days later he was admitted to Aurora Las Encinas Hospital in Pasadena, California, where he remained until April 22. His prognosis at discharge was "good with … follow up."

Despite that positive outlook, on May 9, roughly two weeks after his release from Aurora Las Encinas, Appellant was apprehended by police while "in a florid manic state."

---

[1] The expert who conducted the test opined that anxiety and distractibility likely artificially depressed Appellant's score, but stated that Appellant's true IQ would be "extremely low … what we used to call the mild mentally retarded range."

Believing himself to be an FBI agent sent to instruct children on how to respond to a terrorist attack, he attempted to enter a school, made threats, crashed his car into a school bus, and then attempted to kill himself. He was again admitted to the hospital, this time at Del Amo Hospital in Torrance, California. There he was diagnosed with bipolar disorder. His initial seven-day commitment was extended to fourteen and then thirty days, as a Los Angeles County Superior Court repeatedly found him "gravely disabled" under the pertinent California statute—meaning that he was incompetent to feed, clothe, and shelter himself. He was finally discharged on June 26. His prognosis was good, if he continued hospital treatment and his medication regimen, which consisted of two drugs twice daily and another drug once daily. He was prescribed a thirty-day supply of these medications. It is unclear if he ever obtained them.

## E. The appeal

Appellant's brief to the CCA was filed on April 27, five days after his release from Aurora Las Encinas. Following his admission to Del Amo, the severity of Appellant's condition prompted his treating physician to contact Appellant's defense counsel, unsolicited, on May 18 to alert them to the diagnosis and its potential impact on his case. Consequently, on July 30, 2018, just over a month after his release from Del Amo, Appellant moved the CCA to stay appellate proceedings and order an inquiry under Rule for Courts-Martial (R.C.M.) 706. The Government elected to oppose this motion. Oral arguments were heard on the motion and Appellant's other issues on August 30. During oral argument, Appellate defense counsel declined to make any assertion regarding whether his communications with his client had given rise to any competency concerns. The lower court then denied the motion and affirmed the findings and sentence on September 17, 2018. On February 27, 2019, we granted Appellant's petition for grant of review.

## II. Analysis

Appellant is clearly deeply troubled, and I question how the lower court could conclude on the facts before it that there was not a substantial question about his competence.

But I am more troubled by this Court's decision not to determine whether or not the lower court abused its discretion. That is, in my view, the only appropriate course here. Instead, however, the Court remands the case to afford appellate defense counsel a *fifth* bite at the proverbial apple for reasons that are, at best, strained.

## A. Background principles

"Historically, we have given preferential treatment to the question of mental responsibility of a military member, even [if] the matter was not litigated at trial." *United States v. Young*, 43 M.J. 196, 197 (C.M.A. 1995). This is largely because courts are ill-suited to make mental health assessments, which are "a matter for consideration by highly trained medical personnel." *United States v. Nix*, 15 C.M.A. 578, 583, 36 C.M.R. 76, 81 (1965). Where an appeal is not frivolous or made in bad faith, "to allow the court to determine that there is no cause to believe that an accused may be insane or otherwise mentally incompetent would be inconsistent with the legislative purpose to provide for the detection of mental disorders 'not … readily apparent to the eye of the layman.'" *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

## B. A nexus is required between Appellant's mental health issues and his competence

Rule for Courts-Martial 1203(c)(5) provides:

> An appellate authority may not affirm the proceedings while the accused lacks mental capacity to understand and to conduct or cooperate intelligently in the appellate proceedings. In the absence of substantial evidence to the contrary, the accused is presumed to have the capacity to understand and to conduct or cooperate intelligently in the appellate proceedings. If a substantial question is raised as to the requisite mental capacity of the accused, the appellate authority may direct that the record be forwarded to an appropriate authority for an examination of the accused in accordance with R.C.M. 706, but the examination may be limited to determining the accused's present capacity to understand and cooperate in the appellate proceedings.

This rule clearly and unambiguously requires the Appellant, through counsel, to raise a "substantial question" as to his "present" competence—his "capacity to understand and to conduct or cooperate intelligently in appellate proceedings." A nexus, in other words. It is inconceivable that any litigant or judge involved in this case has any other understanding of this rule, and I struggle to believe that anyone could reasonably think Appellant is urging a contrary interpretation. If there were any doubt about the meaning of this provision, our case law is unequivocal: mere diagnosis with a mental health condition, even bipolar disorder, is not on its own sufficient to require a sanity board. *See, e.g., United States v. Inabinette*, 66 M.J. 320 (C.A.A.F. 2008); *United States v. Shaw*, 64 M.J. 460 (C.A.A.F. 2007); *Young*, 43 M.J. 196. There must be substantial evidence that any mental condition interferes with (in fact, disables) his capacity to understand and participate in the proceedings.

Certainly, appellate defense counsel did himself no favors by failing to explicitly articulate in his brief how Appellant's mental health conditions relate to his competence.[2] But I also believe counsel can be forgiven for assuming that it goes without saying that Appellant was incompetent—or at least extremely likely to be

---

[2] It is true that in Appellant's brief to this Court, he stated that the " 'clear evidence appellant has significant mental health issues' " identified by the CCA "unequivocally" meets the standard for a sanity board. This could be read to say "significant mental health issues," on their own, are enough to justify a sanity board. But in context, this must refer to Appellant's specific mental health issues, for three reasons. First, as noted above, the standard is unmistakably clear. Because the existence of mental health issues is not enough on its own to raise a question of incompetence, the brief must be referring to the specific manifestations of those issues in Appellant's case. Second, Appellant did draw this connection explicitly in his reply brief. Finally, Appellant argued on at least five different occasions at oral argument that the facts of this case raised a substantial question of *present* competence. While counsel might be criticized for the quality of his argument to this effect, there is no question that his position (at least before this Court) was that the evidence raised a substantial question as to nexus.

incompetent—while in a delusional dissociative state and while involuntary committed by a court that found him unable to feed, clothe, or shelter himself. How can a man competently assist his defense when he does not even know his own identity?

What is also clear is that the nexus need not actually be established—an appellant need only raise a substantial question as to that nexus. The issue is not whether Appellant's condition rendered him incompetent to participate in appellate proceedings; that is, after all, to be decided by the court after the completion of a sanity board. The issue is, rather, whether the evidence of Appellant's condition raises a *substantial question* as to his present competence.

On these points of law, it does not appear that I am in meaningful disagreement with the majority, the CCA, Appellant, or the Government.[3] Appellant has had two briefs and two oral arguments to attempt to establish the required nexus. The CCA determined that he had failed to do so. I believe that determination was an abuse of discretion. Rather than weigh in on that question, the heart of the matter, the majority remands the case to give Appellant yet another opportunity to establish the nexus. It seems implicit in the Court's opinion, therefore, the grafting on of certain novel procedural requirements to make this showing. With that I disagree.

C. Appellant must make a nonfrivolous, good-faith claim
that there is a substantial question as to his competence

If all are agreed that the required showing is evidence raising a substantial question as to Appellant's present competence, the divergence must be over what sort of showing must be made to establish that substantial

---

[3] I also agree with the majority that we have never "explicitly held" that a nexus is required. However, unlike the majority, I attach no significance to that fact. The requirement is so obvious as to need no explication, and it is clear that appellate defense counsel understood the requirement and argued accordingly (if not necessarily effectively). There is therefore no justification for remand. If Appellant did not establish a substantial question as to nexus, the conviction must be affirmed.

question, and the standard the CCA must apply in evaluating that showing. The latter, despite being a granted issue here, goes unanswered by the majority, leaving the CCA to repeat a possibly erroneous analysis on remand. The majority provides multiple and conflicting answers to the former.[4]

Appellant contends that a request for a sanity board should be granted if the request is nonfrivolous and made in good faith. *See Nix*, 15 C.M.A. at 582, 36 C.M.R. at 80; *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008). The Government agreed that this is the standard, at least in its brief to this Court. The CCA, however, did not mention *Nix* or this standard at all in its opinion. Neither does this Court, except to refuse to endorse or repudiate it. Although this Court has applied the *Nix* standard fairly recently in its history, we have never expressly decided whether or not it applies to a motion for a *post-trial* sanity board pursuant to R.C.M. 1203(c)(5).

Of course, we need not decide that issue to resolve this case, at least not necessarily. If the lower court's opinion was or was not an abuse of discretion under any potentially applicable standard, we need not reach that question. But rather than taking such a position, the majority instead remands to the lower court without deciding that it abused its discretion and without telling it what standard it should apply. As the issue was granted, briefed, and argued, I see no reason not to provide that guidance, lest we need to return to this issue in this case again, further elongating these proceedings.

The standard matters. Although I conclude that Appellant has met either standard, the standards are *different*. The difference in what the CCA must decide, and what we must potentially review for an abuse of discretion, is between an independent, subjective determination by the

---

[4] We also granted review on the issue of whether the CCA may properly consider the submission of personally asserted matters in reviewing an appellant's motion for a sanity board. The majority also declines to decide that issue, opening the door for further proceedings here if the CCA repeats its use of that information and the Government prevails below.

CCA that a substantial question has or has not been raised, and the much more cabined review of whether Appellant's claim rises to the level of frivolity or bad faith. *See Nix*, 15 C.M.A. 578, 36 C.M.R. 76. Although I think the CCA abused its discretion under either standard in this case, I believe it is at least a closer question under the standard the CCA appeared to use than the one identified by the parties.

Turning to the question of what a movant must show to warrant a sanity board under the applicable standard, I see no need for complicated or sui generis burdens. The movant will present his or her evidence, and, in the opinion of the CCA, subject to review for abuse of discretion by this Court, that evidence will satisfy the applicable standard or it will not. Simple enough.

I share the majority's frustration that appellate defense counsel refused to articulate a personal concern about Appellant's competence based on their interactions. Yet his failure to do so simply detracts from (or, perhaps more accurately, fails to add to) the weight of the evidence in support of Appellant's motion. If, as a result of that choice, the evidence is such that Appellant has not met his burden, the CCA did not abuse its discretion and we should affirm its judgment. If, despite that choice, the evidence is still strong enough to meet his burden, the CCA did abuse its discretion, and an R.C.M. 706 inquiry should be ordered.[5]

It is not immediately clear whether the majority accepts or rejects my straightforward rule that an appellant's motion for a sanity board should be granted if, and only if, the evidence he presents meets the applicable standard. Indeed, the Court's opinion appears to contradict itself. The Court notes that counsel might meet the standard "by presenting documents or averring facts showing a nexus between Appellant's mental illness and an inability to participate in the proceedings." *United States v. Navarette,* __ M.J. __ (6 n.5) (C.A.A.F. 2019). But counsel has done

---

[5] Appellant argues that this Court can itself order an R.C.M. 706 inquiry under these circumstances. As this Court is not resolving that question in its disposition of this case, I will not express an opinion on the merits of that claim.

precisely that in this case. The Court itself seems to acknowledges that Appellant's hospitalizations and delusions during the pendency of his appeal call his competence into question, as it concludes that the CCA may not have "appropriately considered" those facts. *Id.* at __ (7). Either those facts are relevant to establish a nexus between Appellant's condition and his competence, in which case the majority is wrong to claim Appellant failed make a nexus argument, or they are not, in which case the CCA was right to disregard them.

The majority also explains:

> In order to obtain an R.C.M. 706 inquiry at the appellate level, an appellant must make a showing that there is a sufficient reason to question either his mental capacity or mental responsibility. *See United States v. Young*, 43 M.J. 196, 197 (C.A.A.F. 1995). Thus, an appellant must, at a minimum, articulate how his mental condition prevents him from being able to understand or participate in the proceedings. Without such a nexus, Appellant does not raise a "substantial question" as to his mental capacity. Here, Appellant has yet to articulate how his mental condition affects his ability to participate in his appellate proceedings, and it was not an abuse of discretion for the lower court to require him to do so.

*Id.* at __ (6) (footnote omitted).

Was Appellant's failure only that he did not explicitly connect the dots between his delusions and hospitalizations to his participation in appellate proceedings? Although counsel could have been clearer, I think counsel can be forgiven for thinking that Appellant's delusions and repeated commitments spoke for themselves. But if appellate defense counsel's advocacy was inadequate, the CCA appropriately denied relief and Appellant's claim(s) to relief, if any, lies elsewhere.

Was the failure instead that appellate defense counsel did not claim personal concerns about Appellant's competence based on their interactions? First of all, having expressly declined to make that claim on four previous occasions, it seems that Appellant waived any such

argument, although the majority is probably wise not to step onto those particular Penrose stairs.[6] Secondly, while such a claim may be sufficient, I see no reason why it should be *necessary* before a CCA orders a sanity board. Hypothetically, evidence of incompetence could be overwhelming notwithstanding counsel's subjective, lay impression that an appellant is perfectly competent. In that case, counsel should be able to successfully move for a sanity board notwithstanding an inability to claim personal reservations about competence based on client interaction. But if it is the case that appellate defense counsel need not make a specific representation to prevail, there is no need to remand—Appellant has either raised a substantial question here or he has not.

### D. The CCA abused its discretion in not finding a substantial question raised

As set out above, to prevail on a motion for a sanity board under R.C.M. 1203(c)(5), Appellant must: (1) produce evidence (2) raising a substantial question (3) as to Appellant's present capacity to understand and participate in the proceedings.

The evidence produced by Appellant showed that he had been involuntarily hospitalized four times during the course of post-trial proceedings. He spent roughly half of the six months prior to the CCA's decision involuntarily committed. One of those commitments was due to multiple rulings from a California court finding him "gravely disabled," meaning that he was unable to feed, clothe, and shelter himself. At times during this period, he suffered from extreme delusions, losing touch with reality and his own identity.

After his third hospitalization he was released with a "good" prognosis, conditioned on continued treatment. He was committed yet again. He was released from his fourth hospitalization roughly two months before oral arguments before the CCA, and roughly three months before that court issued its ruling. On that occasion, his prognosis was also

---

[6] Query whether waiver can apply to an argument necessary to determine whether or not an appellant has the capacity to waive an argument.

good, assuming he continued outpatient treatment and maintained his medication regimen. Although he was prescribed a one-month supply of these medications, it was not clear from the record if he actually obtained them, if he had the means to do so, or if he actually took them as prescribed if he did. Nor was his level of access to psychiatric care apparent.

At the time the CCA considered and ruled on his motion, Appellant was suffering from five diagnosed mental health issues requiring at least three separate prescription medications and regular outpatient treatment. Although he had been released from his fourth inpatient hospitalization, he had suffered serious relapses requiring further treatment relatively soon after each of his three previous releases from treatment.

Given these facts, I would find—regardless of the applicable standard—that it was an abuse of discretion to conclude that there was no substantial question as to Appellant's competence. This is not to say Appellant was or is incompetent. It is, of course, entirely possible that Appellant was competent at the relevant times. Perhaps it is even likely. But it is not the court's place to determine whether or not Appellant was competent—at least, not until it receives a report of a sanity board. Rather, the court must determine whether the evidence raises a *substantial question* as to Appellant's competence. As Appellant was obviously incapable of understanding and assisting in his defense at various stages throughout the course of appellate proceedings, and his condition was prone to recurrence, I conclude that a substantial question was raised under any standard, and this case should have been turned over to the medical professionals.

That having been said, it is incorrect to say that the CCA did not consider the mental health issues I have discussed. It clearly did so. However, the CCA determined that Appellant had been restored to competence and, that being the case, he needed to produce evidence of *subsequent* incompetence. This was either an abuse of discretion or it was not. I conclude that it was. The fact that counsel could benefit from a do-over, however, does not justify remand.

### III. Conclusion

For the foregoing reasons, I conclude that an R.C.M. 706 inquiry should be ordered. More importantly, though, I believe the resolution of this case should turn on whether the lower court abused its discretion. I therefore respectfully dissent.